UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

ARI TEMAN,

                              Defendant.

---

19 Cr. 696 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion by defendant Ari Teman for compassionate release from

Federal Correctional Institution ("FCI") Miami, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  For

the reasons that follow, the Court denies the motion.

## I.    Background

### A.  Teman's Offense Conduct and Trial[1]

In early 2019, Teman carried out a fraud in which he drew and deposited checks on the

accounts of three of his home-security-company customers, while falsely representing to the

depository and clearing banks that the customers had knowingly authorized the checks.  The

fraudulent checks totaled $333,000.

Teman deposited the first two checks, totaling $36,000, in March 2019.  Notwithstanding

the banks placing holds on and then rejecting these checks, in April 2019, Teman deposited an

---

[1] The Court has previously set out Teman's offense conduct in detail, including in a June 5, 2020
decision denying Teman's post-trial motions, *see* Dkt. 138 ("Rule 29/33 Decision") at 3–12, and
an October 6, 2023 decision denying Teman's motion to extend his surrender date, *see generally*
Dkt. 402 ("Surrender Date Decision").  The Court also reviewed Teman's offense conduct at
length at sentencing, held on July 28, 2021.  *See* Dkt. 276 ("Sent. Tr.") at 67–80.  The summary
in text of Teman's offense conduct draws upon these decisions.

additional 27 checks, totaling $297,000. These checks contained new notations that Teman had added to fortify the illusion of customer authorization. Teman's fraud had been triggered by decisions by the customers on the three accounts to cease using his company's security devices. This had prompted angry and sometimes explosive responses and threats from Teman. Teman, by his own admission, had timed his deposit of certain checks for the eve of Passover, to exploit the religious observance of a customer. Teman deposited the checks despite advice in writing from his counsel, a corporate lawyer, that drawing unauthorized checks on customer accounts would likely result in his arrest and prosecution.

Trial was held between January 22 and 29, 2020, when the jury returned a guilty verdict on all four counts: two apiece of wire and bank fraud.

### B. Teman's Sentencing

Sentencing was held on July 28, 2021. The Court calculated a Sentencing Guidelines range of between 30 and 37 months. The Probation Department and the Government each recommended a Guidelines sentence. Dkt. 123, 150. The Court varied downward, imposing a prison sentence of 12 months and 1 day, followed by three years' supervised release. The Court based this sentence on a review of the 18 U.S.C. § 3553(a) factors. *See* Sent. Tr. 64–94. The Court found this sentence the lowest compatible with the § 3553(a) factors, considered together. *Id.* at 93. The Court, over the Government's objection, granted Teman's motion for release on bail pending appeal. *Id.* at 117.

### C. Teman's Appeal, Post-Appellate Request for Relief, and Surrender

On June 8, 2023, the Second Circuit affirmed Teman's conviction, by summary order, finding Teman's challenges meritless. *See United States v. Teman*, No. 21 Cr. 1920, 2023 WL 3882974, at *4 (2d Cir. June 8, 2023). These included claims of improper venue, constructive

amendment of the Indictment, a deficient verdict form, an abuse of discretion by the Court in not recusing, judicial bias, and prosecutorial misconduct. *Id.* at *1–3.[2]

This Court, heeding Teman's request, recommended that he be designated to FCI Miami, and set a surrender date of October 10, 2023. Dkts. 374, 377. On August 18, 2023, the Circuit's mandate issued. Dkt. 380.

After the mandate issued, Teman filed a series of motions. These included motions to adjourn his surrender date and stay his reporting requirement, Dkt. 384; to vacate his conviction and order a new trial pursuant to Rule 33, Dkt. 386; to vacate his conviction due to purported "sabotage" by a counsel he had retained in connection with sentencing and Government misconduct, Dkt. 388; and to adjourn his surrender date until his latest motions, including under Rule 33, were resolved, Dkts. 394, 400. In an October 6, 2023 decision, the Court declined to extend Teman's surrender date, *see* Dkt. 402. Although stating that its intention was to resolve Teman's Rule 33 motion alongside his anticipated 28 U.S.C. § 2255 motion, the Court assessed that the Rule 33 motion had an "exceedingly low" chance of success, *see id.* at 4–5.

On October 8, 2023, two days before his scheduled surrender date, Teman, *pro se*, filed a letter styled as an "emergency motion." It sought, anticipatorily, his compassionate release from BOP custody or his resentencing to home confinement without imprisonment, on account of his medical conditions, including being immunocompromised and "at high risk of COVID side effects." Teman's letter stated that, since early December 2021: "I have had severe side effects from the vaccine, requiring surgery, ER and doctor visits, and months of recovery, including

---

[2] The Circuit declined to rule on Teman's claim of ineffective assistance of counsel. Finding that claim premature, the Circuit stated that Teman could raise such a claim in a motion pursuant to 28 U.S.C. § 2255. *Id.* at 6. Following the appeal, this Court appointed counsel to assist Teman in preparing a § 2255 motion. *See* Dkts. 367, 371, 385.

significant numbers of supplements and medications, and then still became infected from COVID-19 suffering severe hallucinations, tremors, and requiring additional months of recovery." It added that Teman's risk of exposure to a new COVID-19 variant was heightened because doctors had advised him not to "take another vaccine" due to "severe side effects" and because "there is no evidence the vaccines protect against current variants." In contrast, were Teman at home, the letter stated, he could modulate his diet as he had been advised to do, and limit his exposure to other people. The letter stated, "I am really afraid of getting very sick or dying in prison from COVID." It added that it was "also unfair" that Teman had received "a longer sentence" as a result of an alleged disclosure violation by the Government and his initial sentencing counsel. Dkt. 403.

On October 9, 2023, the Court issued an order declining to alter Teman's surrender date. The order notified Teman that the Court would consider his request for compassionate release after Teman had exhausted his administrative rights with respect to such a motion, pursuant to 18 U.S.C. § 3582(c)(1)(A), and that upon Teman's filing a letter on the docket substantiating that the requirement of administrative exhaustion had been met, the Court would commission a response from the Government. Dkt. 404.

On October 10, 2023, Teman surrendered to FCI Miami. Dkt. 405; Dkt. 411 at 1.

**D. Teman's Compassionate Release Motion**

On October 18, 2023, the Court received, via an email from Teman's father, a letter from Teman dated the same day, in which Teman claimed not to be receiving adequate medical care at FCI Miami. He wrote that he was experiencing fever, gastro-intestinal issues, nausea, dizziness, headaches, tremors, congestion and mucus, and nasal drip. Dkt. 405, Ex.1. By order the same day, the Court directed the Government to contact the Bureau of Prisons ("BOP") and furnish it

with the Court's order and Teman's letter, to inquire about the concerns Teman had raised, and to report back. The Court stated that it would treat Teman's letter as an application for compassionate release, triggering the requirements of administrative exhaustion. Dkt. 405.

On October 20, 2023, the Government filed a letter in response, confirming that, on October 18, it had furnished FCI Miami, via email, with the Court's order and Teman's attached email. Dkt. 406. The Government attached Teman's medical records, obtained from the BOP, as generated since Teman had reported to FCI Miami. These did not substantiate Teman's claims as to his medical conditions. Dkt. 406, Ex. A. The Government further reported that, according to FCI Miami, as of October 19, there was no record of a compassionate release request by Teman, but that FCI Miami had confirmed that it would process and treat Teman's October 18 letter to the Court as such a request. Dkt. 406.

On December 5, 2023, the Government filed a letter reporting it had received a letter that day from the Warden of FCI Miami, denying Teman's compassionate release request. *See* Dkt. 408. The Warden's letter, which was attached, stated that the BOP had evaluated Teman's claim under the guidance applicable to claims of a "[d]ebilitated [m]edical [c]ondition" constituting an extraordinary and compelling reason justifying compassionate release. *Id.*, Ex. A. The BOP stated:

> Your request has been evaluated consistent with this general guidance. However, medical staff has determined that you do not meet the criteria under Debilitated Medical Condition. Specifically, you are not experiencing deteriorating mental or physical health that substantially diminishes your ability to function in a correctional setting. Your claims regarding having a compromised upper respiratory anatomy and physiology and your concerns about potential exposure to COVID-19 do not warrant a reduction in sentence. Currently, your medical status is considered stable and this facility can adequately manage your medical needs at this time.

*Id.*

On December 19, 2023, retained counsel appeared for Teman, Dkt. 410, and filed a supplemental motion in support of his release, Dkt. 411 ("Supp. Mtn."). It attached a CorrLinks email, dated December 18, 2023, in which Teman described his symptoms, interactions with BOP medical personnel, and prison conditions between October 11 and December 17, 2023. Dkt. 411, Ex. 1 ("Teman 12/18 Email"). Teman's email recounted experiencing dizziness, nausea, weight loss due to limited kosher food options and sometimes moldy or spoiled food, falls, and difficulty sleeping. It complained of nighttime noise and lights, cold temperatures, flies, and unsanitary issues including a "disgusting toilet seat." It added: "I am having memory issues, breathing issues at night, waking up unable to breath, and am constantly having GI issues." *Id.* On the basis of Teman's email, counsel argued that Teman's health "has deteriorated while in custody, and [that] the BOP has failed to provide adequate medical and dietary treatment for his serious medical conditions." Supp. Mtn. at 4. Counsel argued that Teman's situation constituted a "extraordinary and compelling circumstance" justifying release, as he has a "serious medical condition," U.S.S.G. § 1B1.13(b)(1)(B)(i), which "requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death," *id.* § 1B1.13(b)(1)(C). Supp. Mtn. at 5–6. Counsel also argued that Teman's early release was consistent with the § 3553(a) factors, *id.* at 6–8, and that Teman would not be a danger to the community if released, *id.* at 7.

On January 10, 2024, the Government submitted a letter opposing compassionate release. Dkt. 412 ("Gov't Mem."). It attached a declaration by FCI Miami Unit Manager Ronnie Matthews, Dkt. 412, Ex. 1 ("BOP Decl."), and Teman's BOP medical records, Dkt. 412, Exs. B–D (filed under seal). The declaration noted that Teman has served just over 30% of his sentence; that he has been assigned a transfer date to a Community Corrections Center ("CCC") of May

14, 2024; that his current home detention eligibility date is June 27, 2024; that he has signed an agreement attesting to his eligibility for community custody and home confinement; and that his current projected release date is August 1, 2024, assuming good time credit. BOP Decl. ¶¶ 2, 6–7. The Government argued that the BOP's medical records contradict Teman's claims about his medical condition and purported lack of medical care, in that that they reflect that Teman has received regular attention while in BOP custody, that his medical condition is stable, and that his evaluations by BOP medical staff do not reflect issues with his cardiovascular or respiratory systems, fever or chills, and reflect that his lungs were "clear." Gov't Mem. at 5 (citing Dkt. 412, Ex. D). The Government separately argued that Teman remains a danger to the community and that the § 3553(a) factors disfavor his release. *Id.* at 6–7.

On January 12, 2024, Teman's counsel filed a one-page letter attaching a letter from Dr. Alon Seifan. Dkt. 413. Dr. Seifan stated that he had evaluated Teman in September 2023, before Teman had entered BOP custody, and that, based on Teman's account of his incarceration, being in prison had disrupted his sleep, which is "essential for his mental and medical stability," and "caused him significant stress." *Id.* at 2. It opined that Teman's "progressively worsened" condition "most likely has induced [his] fainting, falling, vomiting, headaches, and numbness." *Id.* He urged Teman's release, to enable him to have immediate access to "the level of medical and neuropsychiatric care that he needs." *Id.*

## II.    Discussion

The Court first reviews the legal standards governing compassionate release motions, and then applies them to Teman's motion.

### A.    Standards Governing Compassionate Release Motions

Upon the motion of a defendant who has "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," the Court may reduce the defendant's sentence.[3]  18 U.S.C. § 3582(c)(1)(A).  To grant such a motion, the Court must find that (1) "extraordinary and compelling reasons warrant such a reduction"; (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"; and (3) the § 3553(a) factors weigh in favor of a reduction in sentence.  *Id.*; *see also United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2021) (per curiam) (recognizing that both "extraordinary and compelling reasons" and support of the § 3553(a) factors are necessary to grant relief).

"Application of the § 3553(a) factors requires an assessment of whether the relevant factors outweigh the extraordinary and compelling reasons warranting compassionate release . . . and whether compassionate release would undermine the goals of the original sentence." *United States v. Daugerdas*, 613 F. Supp. 3d 807, 812 (S.D.N.Y. 2020) (cleaned up) (citation omitted).  The defendant bears the burden of proving that he is entitled to compassionate release.  *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992); *United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010).

Originally, § 3582(c)(1)(A) did not permit defendants to initiate compassionate release proceedings; it required the BOP to seek such release on their behalf.  *United States v. Phillibert*, 557 F. Supp. 3d 456, 459 (S.D.N.Y. 2021).  But, as part of the First Step Act of 2018, Congress authorized courts to reduce a prison term upon a defendant's motion.  *United States v. Amato*, 48 F.4th 61, 63 (2d Cir. 2022) (per curiam).  Congress had tasked the Sentencing Commission with

---

[3] It is undisputed that Teman has satisfied § 3582(c)'s requirement of administrative exhaustion.

identifying the circumstances that are extraordinary and compelling so as to justify a reduction in sentence. *United States v. Brooker*, 976 F.3d 228, 232 (2d Cir. 2020) (citing 28 U.S.C. § 994(t)). Before November 1, 2023, the Commission's only guidance on this point had been promulgated before the First Step Act. This guidance thus applied only to a "motion of the Director of the Bureau of Prisons," *see* U.S.S.G. § 1B1.13 (historical note), not motions brought by defendants, prompting the Second Circuit to hold in 2020 that the Commission's guidance "[could not] constrain district courts' discretion to consider whether any reasons [were] extraordinary and compelling" in cases involving motions by defendants, *Brooker*, 976 F.3d at 236–37. As a result, through November 1, 2023, a court assessing a defendant's motion was unconstrained by U.S.S.G. § 1B1.13's enumeration of extraordinary and compelling reasons and could "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." *Id.* at 237.

Effective November 1, 2023, the Commission has amended the Guidelines to also cover defendant-initiated petitions. *See* U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254 (effective Nov. 1, 2023). The Commission's amended guidance as to what constitutes extraordinary and compelling reasons now controls a court's analysis of a defendant- or BOP-initiated petition for compassionate release.

The Commission's amended guidance identifies six circumstances that, singly or in combination, may so qualify. Two are potentially germane to Teman's application.[4]

---

[4] The remaining four relate to a defendant's age, U.S.S.G. § 1B1.13(b)(2); family circumstances, *id.* § 1B1.13(b)(3); status as a victim of abuse in custody, *id.* § 1B1.13(b)(4); and unusually long sentence, of which at least 10 years has been served, coupled with a change in the law that would create a gross disparity between the sentence previously imposed and the sentence likely to be imposed at the time of the motion, *id.* § 1B1.13(b)(6).

The first relates to a defendant's medical circumstances. *See* U.S.S.G. § 1B1.13(b)(1). It identifies the following four circumstances as supplying "extraordinary and compelling reasons" for release:

(A)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(B)     The defendant is—

    (i)      suffering from a serious physical or medical condition;

    (ii)     suffering from a serious functional or cognitive impairment, or

    (iii)    experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(C)     The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

(D)     The defendant presents the following circumstances—

    (i)      the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

    (ii)     due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii)    such risk cannot be adequately mitigated in a timely manner.[5]

U.S.S.G. § 1B1.13(b)(1).

The second permits a finding of extraordinary and compelling reasons where "[t]he defendant presents any other circumstance or [a] combination of circumstances" that themselves or with the above circumstances are similar in gravity to those above, such may support sentence reduction. *Id.* § 1B1.13(b)(5).[6]

The Commission's guidance, tracking the statute, requires that, even where extraordinary and compelling reasons are found, the Court must also assure itself that release is consistent with the § 3553(a) factors "to the extent that they are applicable." *See* U.S.S.G. 1B1.13(a) (citing 18 U.S.C. § 3582(c)(1)(A)). The Court must also find that the defendant is not "a danger to the safety of any other person or to the community," *id.,* § 1B1.13(a)(2), as defined in the Bail Reform Act, 18 U.S.C. § 3142(g).

### B.    Application to Teman's Motion

The Court, applying the above standards, denies Teman's application for compassionate release for two independent reasons.

---

[5] Factor (D) was informed by compassionate release decisions arising from the COVID-19 pandemic. *See* U.S. Sent'g Comm'n, Guidelines Manual 2023: Supplement to Appendix C at 206 (November 1, 2023).

[6] The Commission "rejected a requirement that 'other reasons' be similar in nature and consequence to the specified reasons. These need be similar only in gravity." U.S. Sent'g Comm'n, Guidelines Manual 2023: Supplement to Appendix C at 207 ("[T]he Commission continues to believe . . . that judges are in a unique position to determine whether the circumstances warrant a reduction. Guidance beyond that provided in the amended policy statement regarding what circumstances or combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction in sentence is best provided by reviewing courts." (cleaned up)).

### 1.    Absence of Extraordinary and Compelling Reasons

Measured against the standards set by the Sentencing Commission, Teman has not shown extraordinary and compelling reasons to warrant a reduction in his sentence.  Teman's argument on this point is that (1) he suffers from health issues, including respiratory, inflammatory, and digestive issues resulting from an earlier COVID infection and from taking the COVID vaccine, as well as sleep disorders, acute sinusitis, a respiratory illness that causes inflammation, fainting spells, and dietary issues; (2) his health has deteriorated in BOP custody; and (3) the BOP has failed to provide him with adequate medical and dietary treatment for his serious medical conditions.

The Court does not minimize Teman's preexisting conditions, or the extent to which he has found incarceration at FCI Miami arduous and unhappy.  The Court also accepts that the incidents of federal incarceration (cramped quarters, limited food options, and other stressors) may have been responsible for various of the symptoms Teman has reported since October 10, including occasional congestion, GI issues, and dizziness.

In the end, however, the decisive question is not whether Teman would fare better and receive better care if living at home.  It is how Teman's medical conditions measure against the demanding standards set by the Sentencing Commission for when such condition(s) are *extraordinary* and *compelling* so as to qualify for compassionate release.  On that point, Teman's voluminous BOP medical records from FCI Miami supply the most comprehensive and reliable evidence of his present conditions and access to medical care.  These records—which Teman's submissions, counseled and *pro se*, tellingly nowhere reference—bely any claim that these circumstances meet the legal standards governing compassionate release.  On the contrary, they

support the BOP's determinations that Teman's conditions are insufficiently serious to meet these criteria, and that the BOP is capable of addressing his medical needs.

To review:

The BOP's medical records reflect that Teman has repeatedly received medical attention within FCI Miami. He received a BOP medical examination on October 10, 2023, the date of his surrender, *see* Dkt. 412, Ex. D at 26–31; *id.*, Ex. B. at 3; *see also id.* at 1 (noting laboratory and radiology tests on October 10–13). The records reflect another medical examination, on October 20, 2023, when Teman reported a sore throat, dizziness, congestion, and GI issues. Teman then denied having fever, chest pain, palpitations, shortness of breath, or unwanted weight loss, and his lungs were found to be clear. *See id.*, Ex. D. at 20. The records reflect another examination on October 23, 2023, several days after Teman's first (post-surrender) compassionate release motion, *see id.*, Ex. D. at 32–45. The notes of this examination, like the earlier ones, do not reflect any issues with Teman's cardiovascular or respiratory systems. They do not reflect fever or chills. They do not reflect symptoms of COVID-19. On the contrary, the examination found that Teman's lungs were "clear." *Id.* at 40.

Teman was also evaluated on November 7, 2023. The records of that examination note that Teman's main complaint was "dizziness," and that he also complained of nausea and "chest pressure, left arm and leg weakness from food services." *Id.* at 13. Although Teman reported having had chest pressure for 2–3 weeks and left arm and leg weakness for 10–12 days, that evaluation—which included a neurological exam, an EKG, and urinalysis—again did not find any issues with Teman's cardiovascular or respiratory systems. *See id.* at 8–14.

Teman was again evaluated on December 2, 2023, after he reported having fallen. The records of that examination reflect Teman stated that he attributed his "ongoing dizziness and

chills to [the] prior Johnson & Johnson vaccine," and that he "denie[d] associated symptoms";

the examination notes again do not reflect issues with his cardiovascular or respiratory systems,

or other abnormal results, including as to Teman's blood pressure, pulse, and blood oxygenation.

*See id.* at 1; *id.* at 2 ("Respirations even and unlabored"). The exam notes add that Teman was

encouraged to rest and increase his fluid intake, that he received Pedialyte, and that he was

"observed ambulating 2 hours after incident, no acute distress noted[,] reports feeling better." *Id.*

The BOP medical notes also reflect that Teman, on multiple occasions, declined care or

examinations. On October 13, 2023, Teman declined a chest x-ray, writing, "I do not need a

chest x-ray" and "I do not want excessive radiation [without] a specific need." *Id.*, Ex. B. at 13;

*id.*, Ex. D at 79. On October 17, 2023, Teman was offered but refused dental care, writing, "I

have a short sentence and do not want Xrays & excessive radiation." *Id.*, Ex. B. at 12. On

December 1, 2023, Teman declined a medical examination. *See id.*, Ex. D at 7. That day, the

notes state, Teman "was requesting his medical records, but the inmate became defensive,

claiming that his outside Doctor and legal team have the documentation and that he does not

need to prove anything. Inmate leaves my office without having undergone any medical

examination." *Id.* On December 5, 2023, Teman again declined medical treatment, including

"labs." Teman wrote, "My doctors have already established my conditions." He acknowledged

understanding "that by refusing medical [the BOP] is unable to diagnose any disease of the

immune system. *Id.* at 76.

The Court assumes *arguendo* that Teman's chronologic account of his symptoms and

experiences is accurate. *See* Dkt. 411, Ex. 1.[7] But even crediting that narrative, the assembled

---

[7] The Court so assumes notwithstanding Teman's track record in this litigation of making false
and/or reckless claims in the service of requests for relief. For avoidance of doubt, the Court

documentation (medical records plus Teman's account) do not come close to supporting that Teman meets any of the formulations from the Sentencing Commission under which an inmate's conditions qualify as an extraordinary and compelling reason for early release.

Addressing the Commission's four alternative standards in sequence:

The records do not reflect that Teman "is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory)," along the lines of "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." U.S.S.G. § 1B1.13(b)(1)(A). Nothing in the records or Teman's narrative supports this.

The records do not reflect that Teman is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13(b)(1)(B). Even assuming that Teman's conditions—occasional GI issues, chills, and dizziness, which proved redressable at Teman's most recent medical appointment by Pedialyte and rest, and which were unaccompanied by abnormal vital signs—qualify as serious, there is no basis to claim that Teman's conditions are ones "from which he . . . is not expected to recover." *Id.*

The records do not reflect that Teman is "suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant

---

does not assume to be correct Teman's opinions in that account as to medical matters, or his statements about events to which he was not a percipient witness. The Court has also credited Dr. Seifan's pre-incarceration evaluation of Teman from September 2023. But, to the extent that Dr. Seifan's letter of January 11, 2024 (attached to the defense's reply of the same date) asks the Court to draw inferences about Teman's current medical conditions, Dr. Seifan notably does not state that he has reviewed any of the BOP medical records, despite the fact that Teman's full BOP medical records were filed with the Government's opposition of the previous day, and thereby were readily accessible to defense counsel.

is at risk of serious deterioration in health or death." *Id.* § 1B1.13(b)(1)(C).  The medical

records, and Teman's narrative, do not support that he requires long-term or specialized medical

care that he has been unable to access in custody.  And, as the BOP notes, Teman stands in

relatively short order to be released to a CCC—a halfway house—and thereafter to home

confinement.  In both these circumstances, an inmate ordinarily has the ability to access external

medical care.

 Finally, the records do not reflect that, "due to personal health risk factors and custodial

status," Teman "is at increased risk of suffering severe medical complications or death as a result

of exposure to the ongoing" COVID-19 public health emergency, or that "such risk cannot be

adequately mitigated in a timely manner." *Id.* § 1B1.13(b)(1)(D).  The BOP medical records are

devoid of any indication that, in custody, Teman has tested positive for COVID or experienced

any COVID-related (or respiratory) issues.  The medical records also do not support that the

BOP's medical staff would be unable to minister to Teman's needs were he to contract the latest

variant of COVID-19, or were he—contrary to his current intentions—to receive and have an

adverse reaction to the latest vaccine or were he otherwise to become further unwell.

 This case is thus on all fours with the many cases in which courts have denied motions

for compassionate release where the defendant's condition, although impaired, did not meet the

governing standards for compassionate release, *see, e.g.*, *United States v. Barnett*, No. 90 Cr. 913

(LAP), 2021 WL 3550217, at *3 (S.D.N.Y. Aug. 10, 2021) (defendant's diabetes, hypertension,

glaucoma, and enlarged prostate did not qualify), *aff'd*, No. 21-2319, 2023 WL 2375684 (2d Cir.

Mar. 7, 2023); where BOP or other medical records did not substantiate the defendant's claims to

be at risk of serious medical complications or death, *see, e.g.*, *United States v. Carrasco*, 19 Cr.

475-01 (NRB), 2023 WL 375183, at *2 (S.D.N.Y. Jan. 24, 2023) (BOP's medical records did not

support defendant's claims of heart problems); and/or where the defendant did not establish that

the BOP was incapable of attending to his medical needs, *see, e.g.*, *United States v. Binday*, No.

12 Cr. 152 (CM), 2020 WL 4017822, at *6 (S.D.N.Y. July 16, 2020) (the BOP "is capable of

providing . . . adequate medical care, and appears to be doing so" in the defendant's case, given

his detailed health records and the BOP's comprehensive treatment plan). *See also, e.g.*, *United

States v. Olivieri*, 18 Cr. 316 (PAC), 2023 WL 2366859, at *3 (S.D.N.Y. Mar. 6, 2023) (denying

compassionate release where defendant did not provide sufficient records to show the severity of

his gastric ulcers, dementia, coronary artery disease, and congestive heart failure that were

alleviated by the "adequacy of BOP's medical care"); *United States v. Bradley*, No. 19 Cr. 632,

2023 WL 3004660, at *2 (S.D.N.Y. Apr. 19, 2023) (denying compassionate release where the

BOP was able to manage defendant's diabetes, hypertension, high blood pressure, and urinary

tract disorder); *United States v. Castelle*, 18 Cr. 15 (AKH), 2022 WL 4536798, at *2 (S.D.N.Y.

Sept. 28, 2022) (denying compassionate release where defendant was unable to substantiate his

claim of chronic kidney disease with medical proof); *United States v. Herring*, 10 Cr. 391-67

(CM), 2022 WL 633871, at *3 (S.D.N.Y. Mar. 4, 2022) (denying compassionate release where

BOP medical staff was providing "appropriate care" for defendant's complications due to his

obesity); *United States v. Borelli*, No. 84 Cr. 63 (LAP), 2021 WL 2228075, at *3 (S.D.N.Y. June

2, 2021) (denying compassionate release where defendant suffered from diabetes, hypertension,

heart disease, and cataracts and there was "no indication that his medical conditions cannot be

managed—or, for that matter, are not already well-controlled—through BOP-provided medical

care"); *United States v. Gotti*, 433 F. Supp. 3d 613, 619 (S.D.N.Y. 2020) (denying motion for

compassionate release where defendant with heart and lung conditions could be "adequately

treated and monitored" by the BOP); *United States v. LoCascio*, 90 Cr. 1051, 2020 WL

12719849, at *2, *6 (E.D.N.Y. July 17, 2020) (denying compassionate release where BOP was able to "manage" the defendant's chronic kidney disease, coronary artery disease, and heart failure); *United States v. Mood*, 19 Cr. 113 (VB), 2020 WL 3256333, at *1 (S.D.N.Y. June 16, 2020) (denying compassionate release where, despite defendant's hypertension, diabetes, and obesity, his "condition is stable and has been effectively managed by routine monitoring and medication").

The Court thus denies Teman's motion for compassionate release based on his inability to present circumstances qualifying as extraordinary and compelling under U.S.S.G. § 1B1.13(b)(1).[8] That said, the Court is sympathetic to Teman's discomfort and wishes Teman well during his limited remaining time in custody and thereafter. The Court expects the BOP's medical staff to continue to attend, with dispatch, to Teman's medical issues when reported.

### 2.    Balance of Section 3553(a) Factors

Even if the Court had found extraordinary and compelling reasons qualifying Teman for early release, Teman's release would not be consistent with the § 3553(a) factors, considered in combination.

At sentencing, the Court carefully considered and balanced these factors, on route to finding a term of imprisonment of 12 months and one day the minimum necessary to respect these factors, considered in combination. *See* Sent. Tr. 694.

---

[8] To the extent Teman claims eligibility under the catchall provision of U.S.S.G. § 1B1.13(b)(5), which permits a finding of extraordinary and compelling reasons justifying release where "[t]he defendant presents any other circumstance or [a] combination of circumstances . . . similar in gravity" to the circumstances elsewhere enumerated by the Commission, that argument fails. Teman has not cited bases for release other than his medical and physical condition. Given that Teman's conditions do not satisfy the medical and physical conditions provision, U.S.S.G. § 1B1.13(b)(1), these cannot be considered "similar in gravity" to the conditions listed there.

The Court first reviewed factors tending to favor a longer sentence. Just punishment weighed especially heavily, because Teman had schemed to defraud banks of a third of million dollars; because the scheme took time, planning, and effort, and consisted of two waves of fraudulent checks; because Teman carried out the scheme with eyes open and warned by counsel as to its illegal nature; because the scheme exposed not only the banks, but Teman's customers, who were a small co-op board and two landlords, to a meaningful loss; and because Teman's conduct towards these customers had shown "venom, hate and zeal" and had a "distressing" retributive quality. *See id.* at 67–77. General and specific deterrence also favored a meaningful sentence, the latter because Teman had been warned by counsel that he would be arrested and prosecuted, yet persisted in the scheme; because Teman was an adult in his late 30s who had led an advantaged life; and because Teman had continued to blame his customers for his prosecution. *Id.* at 74–78. The interest in public protection was also present because "the record does not inspire complete confidence that once you're done serving your sentence, you will not take liberties with other people's money, particularly if you feel yourself provoked to anger by them," and because Teman had not shown the "self-examination and self-awareness that is a key to future self-restraint." *Id.* at 78–80.

The Court next reviewed mitigating factors. These included Teman's challenges in his youth with bullying; his mental health issues, including treatment for depression and anxiety; complications Teman had from surgery for nasal issues; an unexplained rift that Teman had had with his parents; and the inner turmoil with which Teman appeared to struggle. *Id.* at 80–81. The Court also noted Teman's long and commendable history of philanthropic engagement, *id.* at 82–83, and character letters from friends, family, and co-workers attesting to his philanthropy and acts of kindness, *id.* at 82–88. The Court also took account of COVID-19. Although the

pandemic had largely abated, it still affected imprisonment, and Teman's respiratory history put him at greater risk from COVID-19. *Id.* at 89–90 ("I view the fact of the ongoing pandemic and its uncertain course and its likely impact on the nature of your confinement as mitigating to a degree today, albeit not nearly so much as would have been the case back in September").

In the end, balancing the factors, the Court, although it had "considered seriously" imposing a sentence within the 30–37 month Guidelines range, concluded that a sentence materially below that range was reasonable, including on account of the mitigating factors the Court had identified. *Id.* at 92–93. However, the Court held, "[n]o lesser sentence" than a 12 month and 1 day sentence "would fairly respect the 3553(a) factors considered in totality." *Id.* at 93.

The Court's considered assessment of the just and reasonable sentence remains the same today. There have not been material developments since July 2021 that alter the balance of the § 3553(a) factors. The Court's assessments of Teman's offense conduct and the interests in just punishment, general and specific deterrence, and protection of the public remain as articulated. As at sentencing, Teman continues not to accept responsibility for his offense, as reflected in his disingenuous post-sentencing bids to blame his conviction on improprieties by his customers, the banks that handled their checks, the prosecution, the Court, and various of his own counsel.

At sentencing, the Court also took into account Teman's medical history (including his prior respiratory surgery and complications from it) and the rigors that imprisonment might present for Teman. The Court also took into account that COVID-19 might affect Teman in prison. Thus, the factors on which Teman bases his compassionate release motion were baked into the sentence imposed. And the Court does not find it, at all, unexpected that Teman has

found incarceration unusually trying. Teman himself forecast as much in anticipatorily moving for compassionate release before even reporting to FCI Miami. *See* Dkt. 408.[9]

The Court therefore finds that Teman's early release would be inconsistent with the § 3553(a) factors, taken as a whole. *See United States v. Garcia*, No. 21-1181-CR, 2022 WL 2154675, at *2 n.1 (2d Cir. June 15, 2022) (cleaned up) ("a defendant may not use a compassionate release motion to second-guess the sentence previously imposed"); *see also, e.g.*, *United States v. O'Bryant*, No. 16 Cr. 317-3 (PAE), 2022 WL 17168192, at *3 (S.D.N.Y. Nov. 22, 2022) (denying compassionate release where defendant's "spleen removal" and resulting health effects were "known at the time of [his] original sentencing"); *United States v. Hayward*, No. 19 Cr. 61 (PKC), 2021 WL 1820158, at *3 (S.D.N.Y. May 5, 2021) (denying compassionate release where defendant's "potentially serious underlying health condition" was "known at the time of sentencing"). And Teman's release now, a little more than three months into service of a sentence for a brazen $333,000 fraud scheme, would disrespect the central factors of just punishment and promotion of respect for law. *See, e.g.*, *United States v. Sellick*, No. 21-2328, 2022 WL 16936829, at *2 (2d Cir. Nov. 15, 2022) (summary order) (noting that "[t]he fact that [defendant] has served less than half of his 50-year sentence further supports the district court's decision" to deny compassionate release, given that such an early release "would undermine" the "interests codified in § 3553(a)" (citation omitted)); *United States v. Graham*, No. 16 CR 786 (NSR) (02), 2023 WL 3222483, at *4 (S.D.N.Y. May 3, 2023) (denying compassionate release where defendant "has only served about half of her sentence" and "her early release would

---

[9] As the Sentencing Commission has recognized, a court of course may find extraordinary and compelling reasons for release based on information foreseen as of sentencing. U.S.S.G. § 1B1.13(e). Here, however, the Court took account of Teman's medical circumstances in fashioning the well-below-Guidelines sentence, and does not find the balance of § 3553(a) factors to be consequentially different now.

thereby undermine the sentencing goals"); *United States v. Cook*, No. 13 Cr. 777 (AJN), 2020 WL 7248973, at *2 (S.D.N.Y. Dec. 9, 2020) (denying compassionate release where defendant "has only served approximately 84 months of his 240-month sentence" and to "release [him] at this juncture would cut strongly against the Court's stated purpose of promoting respect for the law, providing a just punishment, and deterring [the defendant] and others from engaging in this type of behavior in the future").

Finally, the year-and-a-day sentence the Court imposed made Teman eligible to earn credit for good behavior in prison and today makes Teman eligible for transfer, relatively soon, out of FCI Miami. According to the BOP, Teman, assuming good behavior, is scheduled to be released to a residential reentry center—a halfway house—on or about May 14, 2024, and from there to home confinement on or about June 27, 2024. BOP Decl. ¶¶ 2, 6–7. On those projections, Teman will have served barely more than seven months in prison, some five months less than the stated sentence imposed. Teman's request for release from FCI Miami in advance of this timetable is unjustified.

## CONCLUSION

For the reasons above, the Court denies Teman's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). The Clerk of Court is respectfully requested to terminate the motion at Docket 411.

SO ORDERED.

*Paul A. Engelmayer*

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: January 24, 2024
     New York, New York